**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **VIRGINIA S. WILBANKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CV-0572-CVE-TLW** |
| | ) | |
| **THE NORDAM GROUP, INC., a/k/a NORDAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 39). Plaintiff Virginia S. Wilbanks filed a petition against defendant The Nordam Group, Inc. (Nordam) on August 20, 2009 in the District Court of Tulsa County, State of Oklahoma. Dkt. # 2-1. The case was removed to this court on September 3, 2009. Dkt. # 2. In her petition, plaintiff alleges federal claims for relief based on violations of the Age Discrimination in Employment Act (ADEA) and Family Medical Leave Act (FMLA), as well as state law claims for relief based on violations of the Oklahoma Anti-Discrimination Act (OADA), wrongful termination, retaliatory discharge, intentional infliction of emotional distress, and respondeat superior[1]. Defendant seeks summary judgment on all claims.

1 Plaintiff has since clarified that her claim titled "respondeat superior" is in fact one for negligent hiring, monitoring, training, and supervision. Dkt. # 43, at 33.

**I.**

Wilbanks, now 64 years of age, began working at Nordam in 1979. Dkt. # 43, at 9, 14. At the time of her termination on October 30, 2008[2], Wilbanks was a master bonder[3] in Nordam's Nacelles and Thrust Reverser Division. Dkt. # 39, at 1. She had been a bonder for the duration of her employment at Nordam. Dkt. # 43-1, at 4-5. Wilbanks's supervisor and others at Nordam characterize her as having been a good employee, and her job reviews show her as meeting or exceeding expectations. Dkt. ## 43-5, at 7, 10; 43-8, at 10.

**A. Comments made by Darlene Tanner**

From 2004 to 2006, Wilbanks suffered a series of on-the-job injuries that required her to be absent from work for various periods of time. Dkt. # 2-1, at 2. As a result of those injuries, Wilbanks received workers' compensation and sought and obtained approval for FMLA leave.[4] Dkt. ## 2-1, at 4; 43-1, at 12.

Plaintiff's petition alleges that her supervisor, Darlene Tanner, was angered by her injuries and corresponding absences, and that around July 2008 Tanner began telling other employees that Wilbanks was too old to work, that she got hurt too easily, and that she should retire. Id. Wilbanks

---

2 Plaintiff's petition alleges that she was terminated "on or about October 29, 2008." Dkt. # 2-1, at 2. However, the parties agree that plaintiff's termination occurred on October 30, 2008. Dkt. ## 39, at 3; 43, at 8.

3 Bonders at Nordam may achieve the "master bonder" designation when they have demonstrated sufficient skill in building parts, training other employees, and reading blueprints. Dkt. ## 43-1, at 5; 43-5, at 4. The master bonder designation is the highest level a bonder can reach at Nordam, and signifies the best bonders in the company. Dkt. ## 43-5, at 4; 43-6, at 4.

4 Wilbanks worked with Sandy Baker, the employee in charge of FMLA leave at Nordam, in coordinating these prior FMLA applications. Dkt. # 43-1, at 12.

testified that Tanner's comments were sparked by a wrist injury suffered by Wilbanks in 2006[5], and that she first heard about the comments after speaking with Kathi Creazzo. Dkt. # 43-1, at 16. Creazzo worked in Wilbanks's position during the time plaintiff was on leave recovering from her wrist injury. Dkt.## 43-1, at 16. Upon Wilbanks's return, Creazzo told Wilbanks that Tanner had been making statements to other Nordam workers that Wilbanks was too old to work. Id. at 17. Creazzo testified that she "personally heard Darlene Tanner, who was Virginia Wilbanks' [sic] supervisor, make specific comments that Virginia Wilbanks was too old, has hurt [sic] too often and wanted to take off work too much," and that "she would not be happy until Virginia Wilbanks was gone." Dkt. # 43-15, at 1. Creazzo was terminated by Nordam in October 2007. Dkt. # 52-3.

Upon her return to work after the wrist injury, Wilbanks also had several conversations with Lynn Pressnall, her lead[6], as to alleged scrutiny of plaintiff by Nordam. Plaintiff testified that:

> Lynn Pressnall kept warning me, saying 'They're watching you. Please be care[ful]." I said, "why are they watching me so close?" "What's wrong with me?" "What have I done?" She wouldn't answer. . . . She'd just say be careful.

Dkt. # 43-1, at 17. Wilbanks also testified that she was told by a number of other Nordam employees that she should be careful[7], and that Tanner had been making comments that Wilbanks

---

5 Plaintiff testified that the wrist injury occurred in 2007. However, Gail Wilkinson, a human resources representative, stated in an affidavit that Wilbanks left work in January 2006 as a result of her wrist injury, and returned to work following that injury in June 2006. Dkt. # 52-3.

6 A "lead" is a member of Nordam's management who helps to coordinate bonders on the floor and handles administrative matters. Dkt. # 43-5, at 4.

7 For instance, plaintiff claims that approximately three months before she was terminated, she was told by co-worker Dennis Hughes to "be careful" because "Darlene wants to get rid of you bad." Dkt. # 43-1, at 19.

was too old, and should retire.[8] Tanner never made any of these comments to Wilbanks directly, nor did Wilbanks hear about any similar comments by anyone else at Nordam. Dkt. # 43-1, at 19.

Although her petition alleges that she notified human resources about Tanner's comments, Wilbanks stated in her deposition that she spoke about them only to Pressnall, approximately six months prior to her termination. Id. at 19. Pressnall told Wilbanks that she would talk to Tanner about her complaint, but Wilbanks was never told whether that occurred. Id.

**B. FMLA Applications**

On August 18, 2008, Wilbanks applied for intermittent leave under FMLA for the purpose of caring for her elderly mother, who suffered from diabetes. Dkt. ## 43, at 7, 9; 43-2. Pressnall knew that plaintiff's mother's had this condition, and that plaintiff was the person responsible for administering insulin to her on a regular basis. Dkt. # 43-1, at 10. Both Baker and Wilkinson, two employees responsible for implementation of FMLA leave at Nordam, testified that plaintiff's application for FMLA leave would have been accompanied by a requirement that she get approval from her supervisor, as well as documentation from a physician where appropriate. Dkt. ## 43-8, at 5; 43-16, at 7. However, Pressnall testified that her understanding of Nordam's policy was that documentation for FMLA-excused absences could be processed following an employee's absence where appropriate. Dkt. # 43-5, at 5-6.

On the day she filed her the FMLA application, Wilbanks left work early to take her mother to the doctor. She claims that she obtained permission from Pressnall for her early departure, in

---

8 Wilbanks attributes such statements to the following individuals, all of whom were her co-workers at Nordam: Hughes, Billy Dees, Glen Hagen, Guy Webb, Dan Yancy, Joyce Alley, Robin Callaway, Gentry Moore, Catherine Cadman, Brenda Washausen, Sonya Brown, and Mark Price. Dkt. # 43-1, at 18-19. Alley filed an affidavit stating that Creazzo told her about Tanner's comments about Wilbanks. Dkt. # 43-14.

keeping with her understanding that Nordam policy required employees leaving early to notify only their lead. Dkt. ## 39, at 2; 43-1, at 8-9.[9] Pressnall later gave Wilbanks written notification from the human resources department that her early departure on August 18 would be recorded as an unexcused absence. Id. Wilbanks arrived late to work on August 19, 20, and 27, 2008. Dkt. # 39, at 2; 43-1, at 9-10. She claims that, pursuant to Nordam policy, she called in on each of those days to inform Pressnall that she would be arriving late because she needed to care for her mother, and that Pressnall gave her approval and said she would tell Wilkinson. Dkt. ## 43, at 10; 43-1, at 10-11. Wilbanks received verbal notice from Pressnall on August 27 that her absence that day would be unexcused. Dkt. # 43-1, at 10.

## C. Final Warning

On August 28, 2008, Wilbanks was given a Stakeholder Corrective Action Notice[10] during a meeting in Wilkinson's office at which both Wilkinson and Pressnall were present. Dkt. ## 39-5, 43-4. The Notice informed Wilbanks that:

---

[9] Pressnall testified that she told Wilbanks that when taking FMLA leave it was the employee's responsibility to tell human resources, and that she did not inform anyone of Wilbanks's absences. Dkt. # 43-5, at 6. Pressnall clarified that she would have been the one to inform human resources only in the event of an emergency. Id.

[10] Plaintiff refers to this document as a Final Written Warning. Dkt. # 43, at 7.

> On June 8, 2008, you received your annual allocation of 40 paid personal absence hours. By August 8, 2008, your paid personal absence time was depleted. On August 18, 2008, you received notification that your early departure at 12:01 PM was recorded as an unexcused absence. On August 19th and August 20th you arrived late to work. On August 27th, you arrived late for work and received a second notification that this absence was unexcused. . . . .
>
> This is a Final Written Warning. Any further instance of late arrival or early departure without prior approval from your immediate supervision [sic] will result in termination.
>
> If you believe your attendance issues are covered under [FMLA], you may request a package to complete and submit for approval.

Id. The Notice was signed by Wilbanks, Pressnall, and Wilkinson. Id. During that meeting, the only thing said by Pressnall to Wilbanks was "[y]ou've done this for so long. You're not going to do it again." Dkt. # 43-1, at 8. Plaintiff believed Pressnall's comments to refer to absences from her job. Id.

**D. FMLA Approval**

Plaintiff filed an additional application for FMLA leave for her own disability on August 29, 2008[11]. Dkt. # 43-9. On October 11, 2008, Nordam approved Wilbanks's requests for FMLA leave for both her mother's medical condition (effective August 18, 2008) and her own medical condition (effective August 29, 2008). Dkt. ## 39, at 2; 39-7. Nordam acknowledged that the nearly two-month lapse between filing and approval of plaintiff's applications was abnormally long. Dkt. # 43-8, at 9. This delay may have been caused by a change in Nordam's human resources computer systems in 2008 that required substantial time from Baker, the Nordam employee in charge of processing Wilbanks's FMLA request. Id. However, Nordam's policy is that FMLA leave may be

---

11 Wilbanks also suffers from diabetes. Dkt. # 43-5, at 8. Pressnall was aware that this disability required plaintiff to be occasionally absent from work. Id.

granted retroactively to excuse appropriate absences that occurred in the interim between application and approval.[12] Id. at 9-10. Wilbanks testified that she discussed with Pressnall the need for retroactive application of her FMLA leave to expunge the warnings she had received based on FMLA-eligible absences,[13] and that she discussed the same issue with Baker two days before she

---

12 Jonathan Bagrosky, Nordam's vice-president of organizational performance, testified that after Wilbanks's FMLA application was approved, the "proper process . . . would have been for [Wilkinson] to contact Ms. Wilbanks to get documentation for those absences to see if they were covered under the [FMLA]," and that both Wilbanks and Baker shared a responsibility for seeing that this process was followed. Dkt. # 43-7, at 9-10.

13 In relevant part, Wilbanks testified as follows:

> Q. [Y]ou applied for FMLA leave, and you believe that [it] . . . was subsequently approved after you got this corrective action notice . . .?
>
> A. Yes. . . .
>
> A. And that it should have been revoked or removed from – from my records.
>
> Q. And did you have any discussions with anybody at the company about revoking this [corrective action notice]?
>
> A. I told Lynn Pressnall. . . .
>
> Q. All right. What do you remember telling Miss Pressnall about revoking this written warning . . .? . . .
>
> A. I said they should go back and revoke this because it was already approved. . . .
>
> Q. And what did Miss Pressnall say to you . . .? . . .
>
> A. You're right. . . .
>
> Q. Did she say she was going to do anything or that you should do anything?
>
> A. She didn't say anything. She didn't really talk to me that much about anything. (continued on next page)

was terminated. Dkt. # 43-1, at 11-12. Baker does not recall having any conversation with plaintiff about retroactive application of her FMLA benefits. Dkt. # 43-8, at 9-10. However, Raymond Henry (Trey) Siegfried III, Nordam's vice chairman, testified that he received phone calls from Wilbanks complaining about the handling of an issue concerning her attendance approximately one month prior to her termination. Dkt. # 43-6, at 6. Siegfried said that, at that time, he referred the issue to Wilkinson for her investigation. Id. at 8.

**E. Termination**

On October 27, 2008, Wilbanks pulled a muscle in her back while at home. Dkt. ## 39, at 2; 43-1, at 15. She received treatment for her injury in the emergency room of St. John Medical Center in Owasso, Oklahoma. Id. Philip Murta, D.O., gave plaintiff a note excusing her from work for October 27-29, 2008.[14] Id.; Dkt. # 43-11. Wilbanks claims that the note was given to her with the proviso that she could "[g]o ahead and go to work," but that if she became unable to work, she could "tell [her employer] that [she] came last night and show them th[e] note." Dkt. # 43-1, at 15. She was told that if she could work, she should not "even bother with th[e] paper." Id.

---

(continued from previous page)

Dkt. # 43-1, at 11-12. Pressnall testified that she did not have the authority to revoke Wilbanks's final written warning on the basis of excused absences, and did not know Nordam's policy as to such retroactive excusal of absences. Dkt. # 43-5, at 14-15. However, she testified as a member of management that a termination based on an invalid written warning would also be an invalid termination. Id. at 15.

14 The note written by Murta reads: "Patient Excuse – Virginia Wilbanks was seen on 10/27/2008 and is excused from work from 10/27/2008 through 10/29/2008." Dkt. # 43-11.

The following day, October 28, Wilbanks arrived at work in the morning.[15] Dkt. # 43, at 11. She informed Pressnall that she needed to leave early to take her mother to the doctor, but said that she would return to work during her mother's appointment, and that she would return again after taking her mother home. Dkt. ## 39, at 2; 43-1, at 13. Pressnall approved the arrangement. Dkt. ## 39, at 2; 43, at 11. Plaintiff claims that Pressnall told her to get a note from the doctor confirming the purpose of her absence, and also "warned her to be very careful because [Tanner and Wilkinson]. . . were watching her." Dkt. # 43, at 11. Pressnall testified that she told Wilbanks to be sure to let Baker know about her absence. Dkt. ## 39, at 2-3; 39-9, at 3. Pursuant to the alleged arrangement with Pressnall, Wilbanks left work and took her mother to the doctor. In the process of doing so, Wilkins had to lift her mother and put her in a wheelchair, which aggravated her back injury from the previous day. Dkt. # 43-1, at 15. After taking her mother to the doctor, Wilbanks returned to Nordam, but did not go back to the bonding floor. Dkt. ## 39, at 3; 43-1, at 14.

Instead, according to Wilbanks, she went to Baker's office because she felt that her back hurt too much to work. Dkt. # 43-1, at 14. Wilbanks informed Baker that she was unable to work

---

15 Plaintiff claims she showed the note from the doctor to Pressnall upon arriving at work on October 28. Dkt. # 43-1, at 15. Pressnall then allegedly told plaintiff "maybe you shouldn't be here," to which plaintiff replied "[w]ell, I can work. It's not hurting right now. . . . Who knows, you know, it might start acting up again. I don't know. . . . Right now I can work." Id.

because of her back[16], and told her about the note she had excusing her from work.[17] Id. Wilbanks expressed concern at this point about being fired for attendance, but Baker told her to leave the note and assured her that she would not be fired. Id. Wilbanks further testified that she talked to Baker at that time about the Corrective Action Notice she had received, and that she told Baker that she thought the triggering violations for that notice should have been excused as FMLA leave. Id. at 12. After her conversation with Baker, Wilbanks left the note excusing her from work with Baker's receptionist, and did not return to work on October 28 or 29. Id. at 14.

On the afternoon of October 29, 2008, a conference call was held among Pressnall, Wilkinson, Tanner, and Baker regarding Wilbanks's behavior the previous day. Dkt. # 43-5, at 13. On October 30, 2008, Wilbanks returned to work. Pressnall told Wilbanks that there was a meeting Wilbanks was to attend, but did not inform her of its purpose. Dkt. # 43-1, at 6-7. Plaintiff remembers the following individuals being present at the meeting: Tanner, Wilkinson[18], Pressnall, and possibly another individual from the human resources department. Id. At the meeting, Tanner

---

16 Baker testified that Wilbanks's reason for wanting to leave was to care for her adult daughter who was in the hospital, and that it was only after Baker informed Wilbanks that such an absence was not covered by FMLA that she showed her the note from the doctor Dkt. # 43-8, at 11. At that point, Baker says that she told Wilbanks, "[w]ell, you're not even supposed to be at work anyway." Id. Wilbanks admitted that she told Baker that she needed to pick up her granddaughter, who was stranded at the hospital with Wilbanks's daughter. Dkt. # 43-1, at 20. However, according to Wilbanks, that did not factor into her reasons for taking an excused absence from work. Id. She did not dispute being told by Baker that according to her doctor's note, she should not even be at work. Id. at 21.

17 Wilbanks did not testify that she informed Baker at that time about the specific instructions from her doctor regarding her ability to choose whether to work.

18 Although multiple sources place Wilkinson as having been present at Wilbanks's termination meeting, Wilkinson testified that she was not present. Dkt. # 43-8, at 10.

told her that she was discharged for reasons contained in a letter of termination.[19] Dkt. # 43-1, at 7. Wilbanks testified that the only other explanation that she was given was a comment made by Wilkinson that she had been warned before.[20] Id.

Wilkinson stated that the following individuals were involved in the decision to terminate Wilbanks, besides herself: Tanner; Pressnall; Roger Hebermehl, management for Wilbanks's division; Randy Brewer, vice-president of Wilbanks's division; John Bagrosky, vice-president of organization and performance; Siegfried; and Steve Andrew, counsel for defendant. Dkt. # 43-16, at 9. The explanation for Wilbanks's termination varies among the parties involved. For instance, Pressnall identified "attendance issues and [being] on a final written warning" as the reason for the termination. Dkt. ## 43-5, at 11; 43-7, at 8. Siegfried also recalled attendance as the only basis for Wilbanks's dismissal, and was not informed of either plaintiff's application for FMLA leave or her

---

19 Plaintiff's testimony is unclear as to when she was given the letter. Compare Dkt. # 43-1, at 7 (Q: "Did she give [the letter] to you?"; A: "No") and Dkt. ## 43, at 11; 43-10 (stating that "[o]n October 30, 2008, Wilbanks received a letter notifying her that her employment was terminated and attaching the letter as an exhibit).

20 A script was prepared for Wilbanks's termination, although it is not clear whether the statement was read to Wilbanks during the meeting. The script reads, in relevant part:

> Your conversation with Sandie [sic] on Thursday was very interesting.
>
> Part of what was interesting is that neither Lynn or [sic] Darlene was aware that 1) That you weren't coming back to work on Tuesday[;] 2) That you went to the hospital[;] 3) You weren't even supposed to be at work based on Doctor's orders[.]
>
> This is the second time within 3 months that you've put your safety and the Company at risk: 1) August 19th, without authorization, you worked 9.25 hours on a medical restriction of 8 hours per day[;] 2) You worked on October 27 and October 28 on a medical restriction that you should not be at work on October 28 or 29 . . .

Dkt. # 43-12.

alleged work beyond doctor's restrictions[21]. Dkt. # 43-6, at 10-11. According to Wilkinson, the two main justifications for Wilbanks's discharge were her attendance and her presence at work in violation of doctor's restrictions.[22] Dkt. # 43-16, at 10. Bagrosky, Wilkinson's superior, was contacted for approval of Wilbanks's termination on the basis of both her final written warning and working beyond doctor's restrictions. Dkt. # 43-7, at 8 (commenting that he approved the termination on those grounds, as either could have been a fireable offense). Tanner, however, testified that Wilbanks's termination was based only on her work beyond doctor's restrictions, and that plaintiff's absences did not play a role in the discharge decision. Dkt. # 43-13, at 11. Finally, Baker, though not identified as a decision maker regarding Wilbanks's termination, testified that she believed the termination to be performance related. Dkt. # 43-8, at 10.

[21] Plaintiff's co-workers addressed working beyond doctor's restrictions in their affidavits. Creazzo testified that in her three-year period of employment with Nordam, she "was routinely asked to work beyond [] restrictions that were placed on [her] by [her] doctor and [] was not disciplined for doing same." Dkt. # 43-15, at 1. Alley also stated that another co-worker, Robin Callaway, "worked beyond her doctor restrictions/limitations for an on-the-job injury during the same time period as Ms. Wilbanks, yet Ms. Callaway was never disciplined nor terminated for doing so." Dkt. # 43-14, at 1.

[22] Wilbanks had also been previously disciplined for improper use of her cellular telephone at work. Dkt. ## 43-5, at 9; 43-16, at 10. However, Nordam employees have stated that she was not terminated for that reason, Dkt. # 43-16, at 10, and plaintiff does not argue that the incident played a role in her termination. Thus, that disciplinary incident is not considered as part of her termination.

Wilbanks alleges she has suffered extreme emotional distress following her discharge by Nordam due to the event of termination itself, the loss of her income and benefits, and the effects of Tanner's comments as to her age and disability. Dkt. # 43-1, at 21. She was treated for distress at Claremore Indian Hospital and prescribed a course of antidepressants. Id. at 23. Wilbanks has applied for Social Security benefits, and wants to retire. Id. at 22-23.

Wilbanks alleges that she filed a charge of discrimination with the United States Equal Employment Opportunity Commission on March 18, 2009. Dkt. # 2-1, at 1-2. She received her notice of right to sue on August 5, 2009, and her petition was filed within 90 days of receipt of the right to sue letter. Id.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Defendant seeks summary judgment on all of plaintiff's claims for relief.

**A. ADEA**

The ADEA makes it unlawful for any employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiff brings claims under the ADEA for hostile work environment, retaliation, and discrimination.[14]

[14] In its summary judgment reply, defendant appears to argue that Wilbanks did not allege in her petition that she was discharged because of her age, and that any ADEA claims by plaintiff should therefore be limited to retaliation and harassment. Dkt. # 52, at 8. It is unclear whether defendant seeks to bar plaintiff's discrimination claim or merely to limit the retaliation claim to events surrounding plaintiff's report to human resources. If the former, the Court does not find defendant's argument persuasive. While inartfully drafted, Wilbanks's complaint contains multiple allegations that she was subjected to discrimination based upon her age, and that she was subsequently terminated. Moreover, her claim for relief is titled "age discrimination, hostile environment [, and] retaliation." As to the limitation argument, the Court agrees that plaintiff's claim is for retaliation based on her report to human resources, but does not find the claim expressly confined to the circumstances surrounding that report. Given the liberal pleading requirements, the Court will treat Wilbanks's ADEA claims as stating broad claims for harassment, retaliation, and discrimination.

**1. Hostile work environment**

A hostile work environment claim is cognizable under the ADEA. E.g., Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834 (6th Cir. 1996). To survive summary judgment on a hostile work environment claim, Wilbanks must show that a "rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the harassment was based on age. See DeWalt v. Meredith Corp., 288 F. App'x 484, 495 (10th Cir. 2008) (unpublished)[15]; MacKenzie v. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005). Courts look to the totality of the circumstances in determining whether a workplace was sufficiently hostile, including "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." MacKenzie, 414 F.3d at 1280. "The environment must be both subjectively and objectively hostile or abusive." Id.

Wilbanks alleges that she was subjected to insensitive and derogatory comments and discrimination by Tanner based on her age, and that these comments created a hostile environment. Dkt. # 2-1, at 2-3. However, Wilbanks admits that she never heard Tanner make any of the alleged hostile statements. Instead, evidence of Tanner's comments comes solely from plaintiff's testimony about what she was told by a number of co-workers and from affidavits submitted by former Nordam employees attesting to having knowledge of such statements made by Tanner. Dkt. # 43-1, at 17-18; 43-14; 43-15.

---

15 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

Statements by Wilbanks describing her co-workers' accounts of statements by Tanner are hearsay if relied upon to show that statements by Tanner were actually made. The same is true of Alley's affidavit stating that she had heard about Tanner's statements from co-worker Creazzo. Courts may not consider hearsay evidence in either affidavits or depositions when ruling on a motion for summary judgment. See Fisher v. City of Las Cruces, 584 F.3d 888, 897 n.3 (10th Cir. 2009); Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995). Defendant objected to reliance on inadmissible hearsay evidence, and plaintiff has not proffered any applicable exception to the hearsay rule. Thus, the accounts by Wilbanks or Alley as to what they were told by others about Tanner's statements by others may not be considered as evidence of a hostile work environment.[16] Once those statements are excluded, Wilbanks's only evidence of hostility in the workplace created by Tanner is the affidavit by Creazzo regarding what she heard Tanner say. Dkt. # 43-15. By itself, this evidence is not a showing of pervasive discriminatory conduct sufficient to meet the threshold for a hostile work environment claim.

As plaintiff notes, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007). In Herrera, the court considered a hostile work environment

---

16 These statements could, of course, be introduced as proof of the fact that statements about Tanner's behavior were made to Wilbanks and Alley. E.g., Starr, 54 F.3d at 1548. However, Wilbanks's complaint centers on actions by Tanner, not on statements made by other employees about Tanner. Moreover, the mere fact of allegations by employees as to derogatory statements in the workplace does not create the level of systemic harm envisioned by the hostile work environment doctrine. Indeed, to hold otherwise would allow employees to bring claims against the employer by simply alleging that derogatory statements had been made, without the burden to prove the truth of the employees' assertions. For related reasons, the Court finds plaintiff's testimony as to warnings she received about being under scrutiny not relevant to a showing of hostile environment, as those warnings could be introduced only to show that plaintiff received them, not for their truth.

claim based on racial animus.[17] The plaintiff presented evidence of discrete occasions where his supervisor made discriminatory statements directly to him and to others, as well as evidence of ongoing harassment of plaintiff on racial grounds. Id. at 681-82. He also showed that his supervisor had transferred another employee to plaintiff's place of employment specifically for the purpose of getting rid of plaintiff, and that the employee also engaged in racially motivated harassment. Id. at 682-83. After considering all of the evidence, including testimony of direct statements made by the supervisor to plaintiff and others, the Herrera court found there to be a "close question" as to whether racial harassment of the plaintiff was sufficiently pervasive to support a claim for hostile work environment. Id. at 683. However, the court ultimately decided that plaintiff had established a genuine issue of material fact as to pervasiveness, and denied the motion for summary judgment. Id.

As seen in Herrera, claims based on hostile work environment will survive summary judgment only upon a showing of a "steady barrage of opprobrious . . . comments" that create a subjectively and objectively hostile environment. Id. at 680; see also DeWalt, 228 F. App'x at 495 (rejecting plaintiff's claim for hostile environment based on generally ageist comments overheard by plaintiff and employer's nitpicking); Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(finding isolated incidents of racist comments insufficient to create actionable hostile environment). One affidavit from Creazzo that Tanner on one occasion made a discriminatory statement about Wilbanks's age does not approach the sufficiency of evidence that courts have found necessary to support a finding of pervasiveness. Nor do the statements by Wilbanks that she

---

17 "[T]he standards, methods, and manner of proof established in Title VII case law are persuasive authority in cases arising under the ADEA, and [] courts routinely employ Title VII and ADEA case law interchangeably." Crawford, 96 F.3d at 834.

was told repeatedly by other employees that she was under scrutiny rise to this level, as they are nothing more than impressions by other employees that Wilbanks was in disfavor and they do not establish a clear connection to age bias. The ADEA is not a civility code, and courts must "filter out offhand comments[] and isolated incidents." DeWalt, 288 F. App'x at 495. Thus, although Tanner's statement to Creazzo may have been inappropriate, and although multiple employees may have given Wilbanks the impression that she was being closely watched, that evidence is insufficient to support her claim under the ADEA. Defendant's motion for summary judgment as to her ADEA hostile work environment claim is granted.

**2. Retaliation**

Wilbanks also brings an ADEA retaliation claim. To make a prime facie case of retaliation, plaintiff must show that: "1) she availed herself of a protected right under the ADEA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions." MacKenzie, 414 F.3d at 1278-79. Where a plaintiff is not able to provide direct evidence of discrimination, she may prove a retaliation claim through indirect or circumstantial evidence under the burden-shifting analysis of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009); see also Jones v. Okla. City Public Sch., 2010 WL 3310226, at * 4 (10th Cir. Aug. 24, 2010). Under the McDonnell Douglas analysis, "[o]nce the plaintiff has made out a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action." Pinkerton, 563 F.3d at 1064. If the employer does so, the plaintiff must show that the alleged reasons for the adverse action are pretextual. Id.

Here, Wilbanks alleges that her complaint to the human resources department about harassment from Tanner resulted in her termination. The filing of an internal grievance alleging harassment qualifies as a protected right under the ADEA. See Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193, 1202 (10th Cir. 2006). Wilbanks's termination was an adverse employment action. Id. Thus, it remains for Wilbanks to establish a causal connection between the two. In her complaint, Wilbanks links her report to human resources to her eventual termination. However, in her deposition, Wilbanks testified that it was not the human resources department that she had notified about the alleged harassment, but rather her lead, Pressnall. Dkt. # 43-1, at 19. Wilbanks stated that her complaint to Pressnall was made roughly six months before she was fired. Id.

"Unless an adverse action is very closely connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation." See MacKenzie, 414 F.3d at 1280. Examining the totality of the evidence in the summary judgment record, plaintiff has not shown any link between her protected conduct and her termination other than temporal proximity. The six-month period between plaintiff's complaint to Pressnall and her termination is insufficient to establish causation by that means. Id. ("[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient"); see also Hall v. Interstate Brands Corp., 2010 WL 3565741, at * 3 (10th Cir. Sept. 15, 2010)(finding a three-month gap between plaintiff's complaint and his suspension "was too long to establish causation by temporal proximity" and citing cases holding same). Viewing all the evidence in favor of the non-moving party, the Court finds that Wilbanks has failed to establish the requisite causation, and has failed to make a prima facie case for ADEA retaliation. Summary judgment is granted on plaintiff's ADEA retaliation claim.

**3. Discrimination**

To make a prima facie case of discrimination under the ADEA, Wilbanks must show (1) [s]he is a member of a class protected by the ADEA; (2) [s]he suffered an adverse employment action; (3) [s]he was qualified for the position at issue; and (4) [s]he was treated less favorably than others not in the protected class. See Sanchez v. Denver Pub. Schools, 164 F.3d 527, 531 (10th Cir.1998). A plaintiff need not show that age was the sole reason for the adverse employment action, but she must show that age "made the difference." See Oglesby v. Hy-Vee, Inc., 214 F. App'x 829, 831 (10th Cir. 2007) (unpublished)[18]; see also Jones (discussing impact of Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009), on Tenth Circuit precedent).[19] Once again, plaintiff may meet her burden by "direct evidence of age discrimination or by the burden shifting framework of [McDonnell Douglas]." Oglesby, 214 F. App'x at 831. Defendant does not dispute plaintiff's establishment of a prima facie case of discrimination, and the Court will assume Wilbanks has met her burden.

Thus, under the McDonnell Douglas analysis, the burden shifts to Nordam to articulate a legitimate, nondiscriminatory reason for Wilbanks's termination. Nordam alleges that Wilbanks's termination was based on her receipt of a final warning for absences and her presence at work

18 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

19 The McDonnell Douglas analysis continues to apply in age discrimination cases following the Supreme Court's opinion in Gross. See Jones, 2010 WL 3310226, at * 3-4. The Gross Court clarified that the ADEA requires "but-for" causation; thus, "to succeed on a claim of age discrimination, a plaintiff must prove by a preponderance of the evidence that her employer would not have taken the challenged action but for the plaintiff's age." Id. at * 3. However, "Gross expressly left open the question of whether the evidentiary framework of McDonnell Douglas . . . is appropriate in the ADEA context." Id. at * 4. The Jones court held that McDonnell Douglas does not speak to the burden of persuasion, but merely the burden of production, and that it is therefore appropriate post-Gross. Id. at * 5.

beyond her doctor's restrictions. Dkt. # 39, at 3. To survive summary judgment, Wilbanks must therefore show that the reasons proffered by Nordam are pretextual. Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1114 (10th Cir. 2007). "Typically, a plaintiff may show pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that . . . he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). Wilbanks alleges that the reason for her termination was her age, and that Nordam's statements to the contrary are pretextual. In support, she alleges that Nordam's statement that she was terminated for working beyond a doctor's restrictions was false, that Nordam acted contrary to its written company policies, that she was treated differently from other similarly-situated employees, and that Nordam has offered inconsistent explanations for her termination. Dkt. # 43, at 29 (incorporating pretext arguments from FMLA section of brief).

None of plaintiff's asserted bases for pretext can survive summary judgment. Apart from plaintiff's burden under McDonnell Douglas to substantiate an inference of pretext, the Supreme Court in Gross recently clarified that a plaintiff suing under the ADEA also has an affirmative burden to demonstrate that age was a but-for cause of the termination. That is, Wilbanks must show that Nordam would not have fired her, despite any of their proffered reasons for termination, but for her age. See Medlock v. United Parcel Service, Inc., 608 F.3d 1185, 1194 (10th Cir. 2010).

Wilbanks has not produced any evidence that supports a reasonable inference that her age was the factor that "made the difference" in her termination.

Abiding by its duty to view the facts in the light most favorable to Wilbanks, the Court credits Creazzo's testimony that Tanner made derogatory age-based comments about Wilbanks and that she heard Tanner state that she "would not be happy until [plaintiff] was gone." Dkt. # 43-15. The Court will also consider Wilbanks's testimony that she was told by Pressnall and others that Tanner was "watching" and that other Nordam employees told her that Tanner had made discriminatory age-based statements about her. However, because these statements are hearsay, they are considered only for the purpose of showing that Wilbanks was made to believe that her job was in danger. They are not considered for their truth – that is, they are not admissible evidence that such discriminatory statements were actually made about Wilbanks, or that she was actually under scrutiny at any time. Thus, plaintiff's theory that her termination was age-based is based on one affidavit with overtones of age discrimination and plaintiff's own concerns that she was under scrutiny because of her age.

The Tenth Circuit has recently affirmed that a plaintiff can carry her burden under McDonnell Douglas by showing even a "weak issue of fact" as to discrimination. See Jones, 2010 WL 3310226, at * 8. However, "the passage of time can . . . render a comment too remote to support a finding of pretext." Kirkpatrick v. Pfizer, Inc., 2010 WL 3199802, at * 7 (10th Cir. Aug. 12, 2010)(holding a comment made ten months prior to termination too remote to establish retaliatory motive). Creazzo was terminated by Nordam in October 2007. Therefore, the latest possible date for Tanner's comments about plaintiff to Creazzo was over a year prior to plaintiff's termination. Moreover, the statements by other employees made closest to plaintiff's termination were those by Pressnall and Hughes telling plaintiff to be careful, made approximately six and three months prior

to her termination, respectively. While closer in time, those statements offer no evidence that scrutiny of plaintiff, if any existed, was based on her age. Given the tenuousness of those statements to age-based discrimination and the passage of time between Tanner's statement to Creazzo and plaintiff's termination, the Court cannot find that plaintiff has linked her termination to discriminatory conduct as to her age.

Without a causal link between age and termination, Wilbanks may be able to show procedural sloppiness and inconsistency on the part of Nordam, but cannot make a proper showing of pretext. See, e.g., Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1199 (10th Cir. 2008)("the mere failure of a company's employees to follow their employer's manuals and written directives, without more, does nothing to suggest discrimination as opposed to perhaps, say, laxity on the part of company employees"). Wilbanks has not made a showing that she would not have been terminated but for her age, and has therefore not met her burden to show pretext. Therefore, Nordam is entitled to summary judgment on plaintiff's ADEA claim for discrimination.

**B. FMLA**

Plaintiff's petition states a claim under FMLA for retaliation. Dkt. # 2-1, at 3. However, in her summary judgment response, Wilbanks refers to a claim for interference with FMLA rights as well. Dkt. # 43, at 20. Defendant does not address this additional theory of recovery in its reply. Dkt. # 52.

The Tenth Circuit has recognized two theories of recovery under FMLA: "an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). Insertion of new theories of relief into summary judgment briefing is not always successful. E.g., Spencer v. Wal-Mart Stores, Inc., 203 F. App'x 193, 196 n.2 (10th Cir. 2006); Orr v. City of

Albuquerque, 417 F.3d 1144, 1153 (10th Cir. 2005); Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). The general rule is that "a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans, 936 F.2d 1087, 1090-91 (10th Cir. 1991). In considering the propriety of introducing of a new claim at a late stage of litigation, the Tenth Circuit has balanced the liberal pleading standard with potential prejudice faced by the defendant. See Green Country Food Market, Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279 (10th Cir. 2004). Here, Nordam was put on notice by the petition of the facts underlying plaintiff's FMLA interference claim, as the claim is based on the same set of operative facts as the claim for retaliation. Moreover, while defendant had the opportunity in its reply to respond to plaintiff's introduction of this claim, it did not mention the addition at all, let alone claim that it faced prejudice or request rejection of a new theory for relief. The Court will therefore accept plaintiff's characterization of her petition as stating claims for both FMLA interference and retaliation. Cf. Jones v. Denver Public Schools, 427 F.3d 1315, 1323, 1323 n.2 (10th Cir. 2005)(considering plaintiff's FMLA claim on grounds of both interference and retaliation where complaint did not specifically state under which theory of recovery his FMLA claim was brought).

**1. Retaliation**

Retaliation claims under the FMLA are subject to the same burden-shifting analysis under McDonnell Douglas as applied to the ADEA claims, and the Court incorporates its statement of the law set out in Section III.A., supra. Thus, if Wilbanks is able to make a prima facie case for retaliation, the burden will shift to Nordam to articulate legitimate, non-retaliatory reasons for

plaintiff's termination. If defendant is successful in doing so, the burden will then shift back to plaintiff to show that those reasons are pretextual.

To make a prima facie case of retaliation, Wilbanks must show that: (1) she engaged in a protected activity; (2) Nordam took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. Metzler, 464 F.3d at1171. Defendant does not argue that Wilbanks has not made a prima facie case, and the Court finds that the close proximity of plaintiff seeking and taking FMLA leave from August to October 2008, and her termination on October 30, 2008, establishes plaintiff's prima facie case for retaliation under FMLA. See id. at 1171-72 (noting that termination very closely connected in time to the protected activity is sufficient on its own to establish the prima facie causation element).

For the reasons stated in the discussion of plaintiff's AEDA discrimination claim, the Court also finds that Nordam has articulated legitimate, nondiscriminatory reasons for plaintiff's termination. The burden therefore shifts to Wilbanks to present evidence of pretext. The pretext threshold is lower for claims under the FMLA than the AEDA; while the latter requires a showing of but-for causation to defeat summary judgment, the former requires only that a plaintiff "present evidence sufficient for a reasonable jury to find that the employer's proffered nondiscriminatory reason was unworthy of belief." See Burris v. Novartis Animal Health U.S., Inc., 309 F. App'x 241, 244 (10th Cir. 2009)(unpublished).[20] Under this lesser burden, plaintiff argues that Nordam's proffered reasons for her dismissal are pretextual based on evidence that plaintiff was not in fact acting in violation of doctor's restrictions and based on Nordam's procedural irregularities, varying

---

20 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

treatment of similarly situated employees, and inconsistent explanations for her termination. Dkt. # 43, at 25-27.

First, Wilbanks testified that according to her doctor's instructions, the choice was hers as to whether to stay home from work.[21] Therefore, she argues, she did not work beyond her doctor's restrictions on the morning of October 28, and justifying her termination on that ground would be mere pretext. However, Wilbanks has not shown that she informed either Baker or Pressnall, the two individuals to whom she spoke about her note, of the doctor's recommendations as to her presence at work. The Court must examine the "facts as they appear to the person making the decision to terminate." Salguero, 366 F.3d at 1168. Based on the facts as they appeared at the time of Wilbanks's termination, the note plaintiff presented excused her from work from October 27-29, and plaintiff's presence in the bonding room on the morning of October 28 violated that restriction. Therefore, the Court will not find pretext based on defendant's interpretation of Wilbanks's medical status, even if mistaken.

Wilbanks's pretext argument also fails insofar as she argues that she was treated differently than other employees who engaged in similar conduct. Dkt. # 43, at 8. Plaintiff claims that she was terminated for working beyond doctor's orders when that same action had not resulted in termination for other employees. An established method of proving pretext is "to show that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness." Nwagbologu v. Regents of Univ. of New Mexico, 33 F. App'x 449, 452

---

21 Defendant argues that Wilbanks's account of what she was told by her doctor is inadmissible hearsay. Dkt. # 52, at 4. However, because the Court finds that plaintiff did not relay her doctor's instructions to Nordam at the time of her termination, it is not necessary to reach defendant's argument, as the truth of what the doctor told Wilbanks is not at issue.

(10th Cir. 2002)(unpublished)(internal citations omitted)[22].  Wilbanks first uses herself as the point

of comparison, arguing that she had previously worked beyond doctor's restrictions and experienced

no repercussions.  However, the only evidence of Wilbanks's prior experience is the letter of

termination given to her by Nordam.  Dkt. ## 43, 43-12.  That letter offers as one reason for her

termination the fact that she had worked beyond restrictions one month earlier, on August 19, 2008.

Construing the facts as favorably as possible for Wilbanks, she still has not presented evidence that

she had any reason to expect she would escape punishment the second time she worked beyond

doctor's restrictions.  A pattern of behavior may be considered differently than an isolated incident

in determinations of pretext.  See Nwagbologu, 33 F. App'x, at 452.

　　　　Moreover, Wilbanks's evidence of experiences by other employees comes only from the

affidavits submitted by Alley and Creazzo.  Alley testified to her "personal knowledge that another

employee, Robin Callaway, worked beyond her doctor restrictions/limitations for an on-the-job

inquiry during the same time period as [] Wilbanks," but was neither disciplined nor terminated for

doing so.[23]  Dkt. # 43-14.  Similarly, Creazzo testified that she was "routinely asked to work beyond

[] restrictions that were placed on [her] by [her] doctor and [] was not disciplined" for doing so.  Dkt.

# 43-15.  These affidavits describe conduct similar to that which provided an alleged basis for

plaintiff's termination.  However, they do not contain any facts showing that these individuals were

"similarly situated" with Wilbanks.

---

[22]　　Unpublished decisions are not precedential, but may be cited for their persuasive value.  See
Fed. R. App. 32.1: 10th Cir. R. 32.1.

[23]　　Defendant objects to the statement in Alley's affidavit regarding disparate treatment of
Robin Callaway as inadmissible hearsay.  Dkt. # 52.  Interpreting the evidence in the light
most favorable to plaintiff, however, the Court will accept as true, for the purposes of
summary judgment only, Alley's statement that she has personal knowledge about the
matter.

Without evidence affirmatively supporting the "similarly situated" requirement, disparate treatment of employees does not support a finding of pretext. See, e.g., Medlock, 608 F.3d at 1195. In Medlock, the Tenth Circuit reviewed a grant of summary judgment on a pretext claim based on disparate treatment. Evidence showed several employees were not similarly situated with the plaintiff; however, there was one unexplained employment decision. Id. The court decided that it could not conclude that the other employee's situation created an inference of pretext on the part of the plaintiff, as such a decision would be based on "sheer conjecture, which [it] ha[d] long recognized is an inadequate basis on which to oppose summary judgment." Id. Here, Wilbanks has not presented evidence from which a reasonable jury could infer that Callaway and Creazzo were employees similarly situated with her. Thus, she has not shown pretext on that ground.

However, plaintiff makes a sufficient showing of pretext based on inconsistencies in Nordam's explanations for her termination. See Paup v. Gear Prods., Inc., 327 F. App'x 100, 112-13 (10th Cir. 2009)(unpublished)[24]; Hare v. Denver Merch. Mart, Inc., 255 F. App'x 298, 304-05 (10th Cir. 2007)(unpublished). In Paup, the court reversed the district court's grant of summary judgment to an employer where testimony as to why the employee was terminated conflicted among various corporate representatives. 327 F. App'x at 113-114. The court took pains to clarify that its opinion did not mean that a company could not change its mind or rely on multiple factors in an employee's termination, and that at trial a company may pursue multiple, even inconsistent, lines of defense. Id. at 113. However, it concluded that on the motion for summary judgment, the plaintiff had met his burden under the McDonnell Douglas framework by showing his employer's stated reasons for termination to be so inconsistent that "a rational factfinder could conclude the reasons were

---

24 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

unworthy of belief." Id.  Similarly, in Hare, the court again reversed a grant of summary judgment to an employer based on an employee's showing of multiple inconsistent justifications for his termination.  255 F. App'x at 304-05.  It found that "[u]nder the McDonnell Douglas framework, contradictions of [that] sort are sufficient to establish pretext for purpose [sic] of summary judgment."  Id. at 305.

Thus, the Tenth Circuit has found that evidence of  multiple, conflicting explanations for why an employee was terminated satisfies an employee's burden of production as to pretext under the McDonnell Douglas analysis.  Here, Nordam's employees have explained plaintiff's termination as based on absences, working beyond a doctor's restrictions, both of those reasons, or neither of those reasons.  Dkt. ## 43-5, at 11; 43-6, at 10-11; 43-7, at 8; 43-8, at 10; 43-13, at 11; 43-16, at 10.  To be sure, "individual participants in a collective termination decision might well provide a variety of reasons for the termination of an employee."  Hare, 255 F. App'x at 305.  However, not only did Nordam employees offer different reasons for Wilbanks's termination, but also the reasons relied on by some employees are disclaimed by others.  For instance, the following is an excerpt from Tanner's deposition regarding her understanding as to why Wilbanks was terminated:

> Q:    [L]et's talk about what you say the reason for the termination was.  Again, it's different than what these other ladies have testified to under oath earlier.
>
> A:    Okay.
>
> Q:    . . . Your reason was that it had something to do with her not – she shouldn't have been at work at all because of a doctor's deal; right?
>
> A:    Yes.
>
> Q:    And in your mind, that's the only reason she was terminated; right?
>
> A:    Yes.

Q: In your mind, it had nothing whatsoever to do with this final warning; right?

A: Yes.

Q: Despite what Gayle [sic] Wilkinson and Lynn Pressnall testified to under oath and despite the fact that you agree they had more knowledge about the termination than you did; right? . . .

Q: . . . You say it's only because of this doctor's note; right?

A: Yes.

Dkt. # 43-13, at 11. Conflicts in testimony take this case out of the realm where various explanations provided by an employer "merely elaborate[] on the initial justification for termination." Ramsey v. Labette County Med. Center, 2008 WL 4672248, at * 3 (10th Cir. 2008). The varying explanations given by Nordam and, in particular, the conflicts between those explanations support a finding under Tenth Circuit precedent that Wilbanks has shown her employer's stated reasons for termination to be so inconsistent that a rational factfinder could conclude the reasons were unworthy of belief.

Because the Court finds Wilbanks has made a sufficient showing of pretext based on these inconsistencies in Nordam's explanations, it need not consider the other grounds for pretext asserted by plaintiff. However, "procedural irregularity" may also provide evidence of pretext where sufficiently serious. See, e.g., Schoenfeld v. AT&T Commc'ns, 1991 WL 50172, at * 2 (10th Cir. 1991). Plaintiff's evidence that Nordam's internal policy called for retroactive removal of her final warning following her FMLA approval, and that Nordam failed to follow its policy in her case, would also support a finding of pretext sufficient to survive summary judgment. Nordam's defense that it was not required to remove plaintiff's absences because she did not properly document them is an argument upon which it may prevail at trial. Dkt. # 39, at 11-12. However, construing the

facts in favor of plaintiff, a reasonable jury could find Nordam's failure to follow its own internal policy persuasive in finding pretext as to why Wilbanks was terminated.[25]

The Court did not find pretext in its consideration of plaintiff's ADEA claims because she failed to make a showing that age was the but-for cause of her termination by Nordam. In contrast, under the FMLA, "a plaintiff need not demonstrate that discriminatory reasons motivated the employer's actions to avoid summary judgment." Burris, 309 F. App'x at 244. Thus, because plaintiff has raised a genuine issue of material fact as to pretext, her FMLA retaliation claim survives summary judgment.

**2. Interference**

A valid claim for interference with rights under FMLA will be found where "an employer interferes with the FMLA-created right to medical leave . . . regardless of the employer's intent." Satterlee v. Allen Press, Inc., 274 F. App'x 642, 645 (10th Cir. 2008)(unpublished)[26]. A prima facie case for FMLA interference requires a plaintiff to show (1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights. Id. Unlike the burden-shifting McDonnell Douglas analysis, the defendant bears the burden on the third element of an interference claim of proving that the employee would have been dismissed regardless

---

25 The Court does not, however, find persuasive Wilbanks's pretext argument based on Nordam's violation of its normal disciplinary policy. Although Nordam has a progressive disciplinary policy that typically advances from verbal warning to written warning to final warning to termination, Dkt. # 43-6, at 11, the policy does not require that every employee disciplinary action proceed through all of the steps. Id. at 13.

26 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

of the employee's request for, or taking of, FMLA leave. Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287-88 (10th Cir. 2007).

Here, plaintiff's testimony, testimony from Nordam employees, and Nordam's approval of her application for FMLA leave provide a sufficient showing that plaintiff was entitled to that leave. The undisputed fact of her termination qualifies as an adverse action. Plaintiff is then left only with the requirement of showing a causal connection between that termination and her exercise of her FMLA rights. In support, Wilbanks argues that because she was terminated for absences that would have been excused under a proper application of her FMLA rights, there is a clear connection between her exercise of her FMLA right to absence from work and her termination. Dkt. # 43, at 20-21. The Court finds persuasive her argument that a genuine issue of material fact exists as to whether she was fired for absences that ought to have been excused under FMLA.[27]

Defendant has not met its burden of showing otherwise. Nordam's evidence is contradictory as to whether Wilbanks's application for or taking of FMLA leave was a crucial factor in her termination.[28] As noted, Nordam's varying explanations for Wilbanks's dismissal require the sort of credibility determinations better left for trial. Moreover, defendant's argument that plaintiff was

---

27 The quick succession of events surrounding plaintiff's application, exercise of rights, and termination also supports an inference of causation, as temporal proximity may be used to establish causation in FMLA interference claims. Satterlee, 274 F. App'x at 646 ("protected conduct under the FMLA closely followed by an adverse action may be evidence of causation").

28 Some Nordam employees have stated that Wilbanks's absences were irrelevant to the decision to terminate her. However, Pressnall testified that knowing Wilbanks's absences were excused under FMLA would likely have affected her decision to support Wilbanks's termination. Dkt. # 43-5, at 15. Siegfried also stated that Wilbanks's absences being excused under FMLA would have factored into his decision regarding dismissal, although he also noted that working beyond doctor's restrictions could also provide sufficient justification for termination. Dkt. # 43-6, at 10, 14.

fired for failure to follow proper company procedures in documenting her time away from work is similarly insufficient to eliminate any genuine issue of material fact. Certainly, as the Tenth Circuit has noted, a plaintiff's request for FMLA leave does not "shelter her from the obligation, which is the same as that of any other employee, to comply with employment policies." McGinnis v. Employer Health Servs., Inc., 246 F. App'x 543, 545 (10th Cir. 2007)(unpublished)[29]. However, construing the evidence in the light most favorable to Wilbanks, the Court finds that she complied with Nordam's requirements as she understood them by informing her lead of the reasons for her absence, calling work on the mornings she would be late, and getting appropriate doctors' notes. Dkt. # 43-1, at 9-10. Therefore, defendant is not entitled to summary judgment on the FMLA interference claims.

## C. State law claims

For the reasons stated below, the Court grants summary judgment as to all of plaintiff's state law claims.

### 1. Oklahoma Anti-Discrimination Act

Plaintiff claims that the OADA, OKLA. STAT. tit. 25 § 1101 et seq., "sets forth a clear and unequivocal public policy regarding discrimination in employment in Oklahoma." Dkt. # 2-1, at 5. However, the OADA "does not provide a private right of action for any protected group other than victims of handicap discrimination."[30] Gardner v. Sears Holdings Corp., 2010 WL 4027814, at * 2 (10th Cir. 2010); see also Bacon v. TCIM Servs., Inc., 2010 WL 915051, at * 1 n.3 (N.D. Okla.

---

29 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

30 "The OADA provides only administrative remedies for victims of . . . age discrimination." Harman v. Oklahoma, 2007 WL 1674205, at *2 (W.D. Okla. June 7, 2007).

March 10, 2010). Both parties acknowledge that Wilbanks is unable to recover under the OADA. Dkt. ## 39, at 8; 43, at 29-30. No factual issue remains as to this claim, and summary judgment is therefore appropriate.

**2. Burk Tort for Wrongful Termination**

Although plaintiff acknowledges her lack of remedy under the OADA, she argues that she has an equivalent tort claim under Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989). Dkt. # 43, at 29-30. Oklahoma recognizes the common law at-will employment doctrine. Darrow v. Integris Health, Inc., 176 P.3d 1204, 1210 (Okla. 2008). Under that doctrine, "employers are free to discharge at-will employees in good or bad faith, with or without cause," thereby depriving employees of any right to sue for wrongful discharge. Id. Burk provides an exception to the doctrine, as it recognizes a tort claim for wrongful discharge where an employee is discharged for "refusing to violate an established and well-defined public policy" or for "performing an act consistent with a clear and compelling public policy." Id. The OADA may provide the policy basis for a Burk tort, including claims filed by alleged victims of age discrimination. See Gardner, 2010 WL 4027814, at * 2; Bacon, 2010 WL 915051, at * 1 n.3. Thus, a Burk claim provides a remedy for actual or constructive discharge of an employee.[31]

Wilbanks appears to rely on the OADA as providing the basis for her Burk claim. Dkt. # 43, at 29-30. As discussed above, Wilbanks has not shown that she was discriminated against on the basis of age. The "significant factor" test for a Burk claim does not require the "but for" causation of the AEDA, although a plaintiff "must do more than show that age was only one of many possible factors resulting in discharge." Medlock, 608 F.3d at 1197. However, the different burdens under

---

31 The Court reads plaintiff's petition as stating only a claim for wrongful termination under Burk. Thus, defendant's argument that plaintiff may not state a claim for age discrimination under Burk, Dkt. # 39, at 8, is correct but irrelevant.

federal and state law have not prevented courts from repeatedly recognizing that a plaintiff's failure to establish federal discrimination claim is equally dispositive of Burk claims. See, e.g., Brown v. Bd. of Regents, 353 F. App'x 169, 172-173 (10th Cir. 2009) (unpublished)[32]; Ruleford v. Tulsa World Publ'g Co., 266 F. App'x 778, 784 (10th Cir.2008) (unpublished); Smith v. Okla. ex rel. Tulsa County Dist. Attorney, 245 F. App'x 807, 818 (10th Cir.2007) (unpublished); Malone v. MAPCO, Inc., No. 91-5073, 1992 WL 26788, at *1 (10th Cir. Feb. 11, 1992) (unpublished). The same is true here. For the reasons stated above, plaintiff has failed to set forth evidence showing that age was a significant factor in her termination, and Nordam is entitled to summary judgment on Wilbanks's Burk tort claim.

**3. Retaliatory Discharge**

Under OKLA. STAT. tit. 85, § 5, no corporation may discharge an employee for filing in good faith a claim for worker's compensation. To establish a prima facie case for retaliatory discharge under section 5, a discharged employee must show "(1) employment; (2) on-the-job injury; (3) medical treatment putting the employer on notice or the good faith start of workers' compensation proceedings; and (4) consequent termination of employment." Taylor v. Cache Creek Nursing Centers, 891 P.2d 607, 610 (Okla. Civ. App. 1994)(citing Buckner v. Gen'l Motors Corp., 760 P.2d 803, 806 (Okla. 1988)). A showing of "consequent termination" requires production of evidence that gives rise to "a legal inference [that] the discharge was significantly motivated by retaliation for exercising one's statutory rights." Wallace v. Halliburton Co., 850 P.2d 1056, 1058 (Okla. 1993); see also Taylor, 891 P.2d at 610. A plaintiff need not meet a "but for" standard for a successful section 5 claim; however, she must "present evidence that does more than show the

32 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

exercise of her statutory rights was only one of many possible factors resulting in her discharge." Blackwell v. Shelter Mut. Ins. Co., 109 F.3d 1550, 1554 (10th Cir. 1997). Where an employee's allegations are sufficient to bring her within the section's protection, the employer is called upon to present an alternate reason for the employee's termination. Buckner, 760 P.2d at 807. However, the employee bears the burden of persuasion that any reason given for termination was pretextual. Id.

Wilbanks filed workers' compensation claims in 2004, 2005, and 2006, and now alleges that the "substantial motivation" for her termination in 2008 was her "on-the-job injury and intent to file a workers' compensation suit." Dkt. # 2-1, at 4. However, Wilbanks has presented no evidence linking her workers' compensation claims with her termination. She does not allege that Nordam discouraged her from filing her claims or that it engaged in a pattern of terminating employees for that reason.[33] Nor can Wilbanks rely on temporal proximity to support an inference of retaliatory discharge, as her last claim occurred approximately two years before her termination. Instead, Wilbanks supports her section 5 claim with the statements made about her age and health by Tanner, and she cites only to her own deposition and affidavits from Alley and Creazzo in support. The Court has excluded as inadmissible hearsay Alley's statements regarding what she was told by Creazzo, as well as statements made to Wilbanks by other employees about Tanner's comments. Once more, the Court is left with only the statement by Creazzo that Tanner made negative comments about Wilbanks's age and health.

---

33 Plaintiff has attached complaints from other former Nordam employees, some of which involved claims for workers' compensation. Dkt. ## 43-17, 43-18, 43-19, 43-20, 43-21, 43-22, 43-23. However, such complaints would be hearsay if introduced for the purpose of showing the truth of the allegations contained therein, and will therefore not be considered as evidence of a pattern of practice. E.g., Eddy v. Waffle House, Inc., 482 F.3d 674, 682 (4th Cir. 2007)(reversed and remanded on other grounds, 128 S. Ct. 2957 (2008)).

Tanner's statement to Creazzo does not specifically mention plaintiff's workers' compensation claims. However, assuming that the statement was made in reference to workers' compensation, it is far too temporally removed to support a finding of retaliation. [34] And even if the Court takes plaintiff's testimony as true that the statement by Creazzo was included in her allegation that Tanner began making derogatory statements about plaintiff in approximately July 2008, Dkt. # 43-1, at 17, one statement about plaintiff's health from one link in the decision-making chain would be insufficient to show that her termination was "significantly" motivated by her workers' compensation claims.[35]

Viewing the evidence in the light most favorable to Wilbanks, a reasonable jury could not conclude that her discharge was significantly motivated by retaliation for exercising her rights under the Workers' Compensation Act, as she has "failed to establish a nexus between her termination and any protected activity on her part." Blackwell, 109 F.3d at 1556. Summary judgment is appropriate on this claim as well.

---

34 Creazzo's affidavit does not say when the statement by Tanner was made. Dkt. # 43-15. Although plaintiff does not remember when she was told about the statement by Creazzo, she said that it was following her return to work after her wrist injury. Dkt. # 43-1, at 17. Wilkinson, a human relations representative, testified that Wilbanks returned to work following her injury on June 12, 2006, and that Creazzo ceased working at Nordam on October 2, 2007. Dkt. # 52-3.

35 Again, the following individuals were involved in the decision to terminate Wilbanks: Wilkinson, Tanner, Pressnall, Hebermehl, Brewer, Bagrosky, Siegfried, and Andrew. Dkt. # 43-16, at 9.

**4. Intentional Infliction of Emotional Distress**

Wilbanks also alleges that statements made by Tanner support a claim for intentional infliction of emotional distress. Oklahoma courts have recognized such a cause of action, also known as the tort of outrage. See Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998). The action is governed by the restricted standards set forth in the Restatement (Second) of Torts, § 46 (1965). Id. In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extent to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376. To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)). Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n. 7 (10th Cir. 2005) (applying Oklahoma law). If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to a jury to determine whether the defendant's conduct could

result in liability. Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress. Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff. See Computer Publications, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla.Civ.App.2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla.Civ.App.2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla.Civ.App.1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App.1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Plaintiff claims that she has suffered severe emotional distress because of defendant's actions. Dkt. # 2-1, at 4. In support of her claim, she argues that the statements made by Tanner to other employees were abusive, and that they could be found by a jury to be outrageous. Dkt. # 43, at 32. Even if none of the Court's hearsay rulings about many of those statements applied, however,

the statements made by Tanner would still not rise to the level of extreme and outrageous conduct as defined by Oklahoma courts, as liability "does not extend to mere insults, indignities, threats[,] annoyances[], petty oppressions, or other trivialities." Mirzaie, 962 P.2d at 681. Plaintiff has alleged nothing more than a finite number of statements made outside her presence that she was not capable of performing her job. This simply does not rise to the level of conduct in any case in which an Oklahoma appellate court has found extreme and outrageous conduct in the workplace setting. Thus, Nordam is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress.

**5. Negligent Hiring, Monitoring, Training, and Supervision**

Although plaintiff's petition titles her claim as one for respondeat superior, she has clarified that it is actually one for "negligently failing to hire, monitor, train, and supervise employees" and "negligently failing to provide the [p]laintiff a reasonably safe workplace." Dkt. # 43, at 33-34. Oklahoma recognizes a tort claim for negligent hiring and retention where vicarious liability has not been established. See, e.g., Jordan v. Cates, 935 P.2d 289, 292 (Okla. 1997). Such a claim "is based on the principle that a person conducting an activity through employees is subject to liability for harm resulting from negligent conduct in the employment of improper persons or instrumentalities in work involving risk of harm to others;" in other words, employers have a duty to hire employers who are "competent and not dangerous." Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1500 (10th Cir. 1994). Thus, an employer will be held liable for an employee's harm to a third party through employment where "at the critical time of the tortious incident[,] the employer had reason to believe that the person would create an undue risk of harm to others." N.H. v. Presbyterian Church (U.S.A.), 998 P.2d 592, 600 (Okla. 1999). "The critical element for recovery

is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage." Id.

Plaintiff's claim rests nearly entirely on tortious conduct on the part of Tanner. She claims that the harm inflicted upon her by Tanner might have been avoided by the adoption of appropriate policies, procedures, and supervision protocols. Dkt. # 43, at 34. Beyond that, she states that the failure of Nordam to follow procedures, including those for FMLA and progressive discipline, and the lack of knowledge about details of Wilbanks's employment by Vice Chairman Siegfried, "testify to a breakdown in Nordam internal operations." Id.

Although plaintiff's complaints about Nordam's operations have some justification, they do not support a tort claim for negligent hiring, monitoring, training, or supervision. The behaviors about which Wilbanks complains are statements made by Tanner, failure by Nordam to follow internal procedures, and lack of knowledge by a Nordam executive. Of these, only the derogatory statements by Tanner qualify as remediable tortious conduct.[36] Moreover, even assuming that the statements were made, Wilbanks has failed to make any showing that Nordam had notice of propensities on the part of Tanner to cause the harm at issue. Plaintiff has attached complaints from other former Nordam employees, presumably in an attempt to show that Nordam was on notice of bad behavior by its personnel. Dkt. ## 43-17, 43-18, 43-19, 43-20, 43-21, 43-22, 43-23.[37] However,

---

36 As stated, the admissibility of these statements is limited, for the reasons discussed above.

37 Defendant argues that these complaints are inadmissible as propensity evidence. Dkt. # 52, at 3-4. However, they might be admissible, if relevant, to show notice of other claims brought against the company on employment grounds. See, e.g., Soden v. Freightliner Corp., 714 F.2d 498, 509 (5th Cir. 1983)(where notice was an element of a products liability case, admitting evidence of other complaints filed against the company in substantially similar circumstances as relevant to question of notice).

none of these complaints discuss conduct by Tanner, nor do they even address conduct sufficiently similar to that complained of by Wilbanks to put Nordam on notice.

Finally, although plaintiff did testify that she complained of Tanner's behavior to Pressnall and Siegfried, the complaints were made after the alleged conduct by Tanner had begun. Complaints about behavior already occurring "cannot be found to provide defendant with prior knowledge" for purposes of showing liability under a theory of negligent hiring. Hill v. Green Bay Packaging, Inc., 2006 WL 1663781, at * 7-8 (W.D. Okla. June 9, 2006). Faced with a lack of evidence that Nordam had notice of any tortious conduct on the part of Tanner, the Court must find that it "lacked knowledge sufficient to impose liability." See N.H., 998 P.2d at 601. Summary judgment is appropriate on this claim as well.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 39) is **granted in part** and **denied in part**: it is denied as to plaintiff's FMLA claims for interference and retaliation; it is granted as to all other claims.

**DATED** this 25th day of October, 2010.

Claire V. Eagan

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT